UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MINHNGA NGUYEN,

 Plaintiff,

v.

THE BOEING COMPANY,

 Defendant.

CASE NO. C15-00793-RAJ

FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

On May 20, 2015, Plaintiff Minhnga Nguyen filed a complaint against Defendant, the Boeing Company ("Boeing"), alleging harassment and discrimination based on her race, national origin, and sex, and termination in retaliation for complaining about the alleged harassment and discrimination. Dkt. # 1. The Court heard this matter in a bench trial that began on April 30, 2018, and concluded on May 3, 2018. After orders on three motions to dismiss and a motion for summary judgment, the only issue remaining for trial was whether Plaintiff was terminated from her employment in retaliation for filing an Equal Employment Opportunity ("EEO") complaint. Dkt. # 46, Dkt. # 111. The trial included the testimony of several witnesses and the admission of various exhibits into evidence. In addition to live testimony at trial, both parties submitted deposition designations from the depositions of Keith Sellers and Plaintiff. Dkt. # 134. The parties also submitted proposed findings of fact and conclusions of law. Dkt. ## 132, 134.

ORDER – 1

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following findings of fact and conclusions of law. For purposes of organization and clarity, the Court has included some subsidiary conclusions of law with its findings of fact, and vice versa. For the following reasons, Plaintiff failed to meet her burden of proof to show that there was a causal link between her protected activity and her termination, and that the "legitimate, non-discriminatory reason" for her termination was merely a pretext for a discriminatory motive. *See Stegall v. Citadel Broad. Co*., 350 F.3d 1061, 1066 (9th Cir. 2003), *as amended* (Jan. 6, 2004).

## II. FINDINGS OF FACT

1) Plaintiff is a Vietnamese woman and resident of the State of Washington. Dkt. # 130 at 49:10-51:7. Plaintiff worked as an Electrical Engineer at Boeing from 1991 until 2009, when she was laid off. *Id*. at 51:8-52:10; 53:11-13. Plaintiff was rehired by Boeing as a Level 3 Systems Engineer in December 2011 and worked there until her termination on November 20, 2014. *Id*. at 54:8-16; Tr. Exh. 28.

2) When Plaintiff was rehired by Boeing in December 2011, she was supervised by Gary Weber. Dkt. # 129 at 151:2-11. Gary Weber was Plaintiff's manager at the time of her termination. *Id*.

3) While employed by Boeing, Plaintiff was subject to employee policies and procedures, many of which were set forth in a document titled, "Employee Expectations and Supporting Policies." *Id*. at 66:8-67:8; Tr. Exh. 10. The document states that "flex or temporary schedules" must be requested in advance, and that employees should call their "supervisor and lead prior to shift start" when reporting absences. In the event that a supervisor or lead does not answer, employees are instructed to leave a message on voicemail and continue calling co-workers until he or she reaches a "person". *Id*.

ORDER – 2

4) Plaintiff was also subject to Boeing's corrective action policy, set forth in a document titled, "Administration of Employee Corrective Action." Tr. Exh. 9. The corrective action policy states that an Employee Corrective Action ("ECA") will be taken when an employee engages in a practice that is inconsistent with the Boeing Code of Conduct, Expected Behaviors for Boeing Employees, U.S. Government security, regulatory and contractual requirements, or ordinary, reasonable, common sense rules of conduct. *Id.*

5) There are seven "Expected Behavior" categories used to classify disciplinary infractions at Boeing. Tr. Exh. 30. These categories can be found listed in a document titled, "Employee Corrective Action Process Requirements (ECAPR)". *Id.*

6) The stages of corrective discipline are typically handled using progressive corrective action. Dkt. # 129 at 77:11-16. The corrective action process does not necessarily include every step, and can begin with any level and proceed to more severe measures for similar subsequent violations. Tr. Exh. 9. The stages of discipline usually progress as follows: (1) verbal warning; (2) written warning; (3) time off from work without pay; and (4) discharge. Dkt. # 129 at 77:11-16.

7) Written warnings, time off from work, and discharge require preparation and issuance of a Corrective Action Memo ("CAM"). Tr. Exh. 9. If an employee has an active CAM on file, and that employee engages in subsequent misconduct of a similar type in one of the seven Expected Behavior categories, then a progressive step of corrective action must be issued. *Id.*; Dkt. # 129 at 77:17-19. The standard duration of an active CAM is twelve (12) months unless additional violations for the same or similar type of offense have occurred. Tr. Exh. 9. If such an additional violation occurs, the previous

ORDER – 3

active CAM's expiration date will be extended to match that of the subsequent CAM. *Id*.

8) One of the seven Expected Behavior categories is "Produce, design, and support our products and services." One of the possible violations within this Expected Behavior category is "Failure to Comply." Tr. Exh. 30. "Failure to Comply" is defined as "Failure to follow documented policies, procedures, or processes that have been previously communicated. Failure to perform designated work, or act or cease to act after being instructed or reminded." The ECA level for this type of violation "[u]sually results in a written warning." *Id*. at 16.

9) Each possible violation also has aggravating and mitigating factors. An aggravating factor of a "Failure to Comply" violation is if that violation involves behavior that "disrupts production," is "confrontational or argumentative," or is "repetitive." *Id*.

10) Plaintiff received two "Failure to Comply" violations in the "Produce, design, and support our products and services" category prior to the date of her termination. Tr. Exhs. 11, 14. Plaintiff received her first CAM in this category on March 14, 2014 for failing to "release documents" after her manager instructed her to do so. This CAM was a written warning. Tr. Exh. 11. Plaintiff's supervisor, Dorothy Todd, asked her to release a drawing. Plaintiff refused to do so because it had not passed a safety test and needed more work. Dkt. #130 at 57:4-16.

11) When Plaintiff received the March 14, 2014 CAM she refused to sign it. In the section for employee comments, she wrote, "I am a victim of James Michael Todd and Dorothy Todd. I was downgraded by JMT and Dorothy retaliating me for reporting the incidence of the Hamilton Sunstrand trip in 2009, when

ORDER – 4

JMT made Kate Vandermeer R1 to satisfy his personal need. That's IT." *Id*. Plaintiff provided no further explanation for these comments at trial.

12) Around the same time that Plaintiff received the March 14, 2014 CAM, she was reassigned to work under a new supervisor, Gary Weber. Dkt. # 129 at 165:2-8. At that time, Weber had a good working relationship with Plaintiff. *Id*. at 165:17-22; Dkt. # 130 at 66:2-3.

13) Weber's group worked primarily on supporting design integration for Boeing's 787 aircraft that were in production. This included the 787-8 and 787-9 programs. Another group had primary responsibility for design integration for the 787-10 program, which was in development at that time. Dkt. # 129 at 176:10-23. Weber's group included a team of engineers that were responsible for completing and correcting a large backlog of functional schematics that were needed by different engineering groups associated with the 787 aircraft programs. *Id*. at 174:21-175:20, 176:10-23. Functional schematics are a tool that is used to aid in error corrections or problems with an airplane. *Id*. at 166:13-19.

14) Plaintiff's primary job responsibility from December 2011 until the termination of her employment was to prepare functional schematics. *Id*. at 166:13-19. The lead engineer in Weber's group with responsibility for functional schematics was Herb Harvey. The other engineer responsible for functional schematics was Wassen Engida. Neither Harvey's nor Engida's primary responsibility was to work on functional schematics. *Id*. at 167:22-168:12. Harvey served as both Engida's and Plaintiff's lead. *Id*. at 168:13-169:3.

15) After Weber became Plaintiff's supervisor, he began encountering several issues with her. These issues included repeated insults directed toward the other members of her group (Dkt. # 129 170:24-171:12; Tr. Exh. 22), repeated

ORDER – 5

failures to record her assignments and progress in completing those assignments in a shared spreadsheet created by Harvey (Dkt. # 129 at 171:13-172:2; Dkt. # 131 at 23:1-24:2; Tr. Exh. 22), her initial refusal to cease using a specific tool when working on functional schematics as instructed (Dkt. # 129 at 178:10-16; Dkt. # 130 at 58:19-59:18; Tr. Exh. 22), and her failure to follow Weber's direction to cease work on the 787-10 program (Dkt. # 129 at 170:13-16, 201:25-202:15, 202:19-205:16, 206:7-207:21; Tr. Exh. 22). The existence of all of these issues is supported by ample testimony and documentary evidence. These issues began as early as April of 2014 and escalated in the summer and fall of 2014. Tr. Exhs. 22, 23.

16) On Friday, July 18, 2014, Plaintiff's eyeglasses were stolen while she was in the restroom. When Plaintiff discovered the theft, she was upset and decided to leave work early. Tr. Exh. 12. Before leaving work, Plaintiff sent an email to Jeff Vick, her technical lead, letting him know that she planned to take "a couple of days off." *Id.* Weber was on vacation at the time, and Plaintiff testified that she believed that Vick was her acting manager while Weber was away. Dkt. # 130 at 68:2-12.

17) Plaintiff did not appear for work on the following Monday, July 21, 2014. Tr. Exh. 13. Plaintiff did not call anyone in advance of her absence on Monday and knew Vick was not in the office at the time she sent her email on Friday. Dkt. # 130 at 69:5-6, 70:22-25. Prior to this incident, Plaintiff was under the impression that Weber preferred in-person communication to report future absences, but that if she wished to have it in writing she could use email. *Id.* at 70:19-20. Plaintiff was also aware that it was Boeing policy that employees must call their supervisor or lead before their shift starts. *Id.* at 135:17-25.

18) On Monday, July 21, 2014, Vick forwarded Plaintiff's email to Weber's manager, Keith Sellers, and Human Resources Generalist Kim Conner. In his email, Vick stated that he "found this e-mail this morning. Since I am not a manager, I am forwarding this to you for any action that might be necessary/appropriate." Tr. Exh. 13. After Keith Sellers received the email, he called Plaintiff and left two messages asking her to call him back that day. *Id.*; Dkt. # 130 at 27:2-4. Plaintiff did not take Sellers' phone calls because she did not feel that it was necessary, and did not respond to his request until Wednesday, July 23, 2014. Dkt. # 130 at 135:2-16, 136:2-6; Tr. Exh. 22 at 45.

19) Plaintiff initially recorded the time for her July 21, 2014 absence as sick leave. On Wednesday, July 23, 2014, Sellers directed Plaintiff to change her time entry for that day to time off without pay because her July 21, 2014 absence did not qualify for sick leave, she did not contact Sellers or her lead to inform them she was sick, and she did not request pre-approval to take a vacation day. Sellers' email also stated that her request to flex that time was denied. Plaintiff informed Sellers that she did not agree with this decision several times but did not change her time entry. On August 4, 2014, Sellers adjusted Plaintiff's time entries according to his directions, as Plaintiff had not done so. Tr. Exh. 22 at 45-46.

20) On August 1, 2014, Plaintiff received an email requesting that she provide "disposition data or business justification for retaining" her laptop. Tr. Exh. 22 at 33. Plaintiff responded that she needed the laptop for her "daily business" with her supervisor's approval. *Id*. On August 4, 2014, Weber emailed Plaintiff and stated that "as discussed," Plaintiff needed to bring in her laptop and turn it in because her "work statement can be fully accomplished with [her] desktop computer." Tr. Exh. 22. Shortly after Weber sent that email,

ORDER – 7

Sellers sent an email reiterating that Plaintiff should turn in her laptop the following morning. Tr. Exh. 22 at 45.

21) Plaintiff then received her second CAM for a "Failure to Comply" violation in the "Produce, design, and support our products and services" category on August 7, 2014 for failing to notify management that she was out of the office on July 21, 2014, and for failing to accurately report her time related to that absence. Tr. Exh. 14. This CAM resulted in time off from work without pay. *Id.*

22) On September 9, 2014, Plaintiff received a parking ticket from Boeing and her car was towed. Tr. Exh. 15. On October 6, 2014, Plaintiff received another parking ticket from Boeing. Tr. Exh. 16. On October 14, 2014, Plaintiff received a CAM in the Expected Behavior category, "Adhere to company agreements, policies, and procedures," for failure to comply with site parking regulations. Tr. Exh. 17. Plaintiff testified that she believed that the October 6, 2014 ticket was a fabrication, but that she parked in no-parking areas on more than one occasion. Dkt. # 130 at 138:5-140:8. There is no evidence to support Plaintiff's allegation that the parking ticket was fabricated.

23) The "Employee Expectations and Supporting Policies" document has a section detailing Boeing's parking rules and regulations. It states that "[i]llegally parked vehicles are subject to ticket and/or "No Notice Towing" at owner's expense," and that vehicles parked in areas not marked for parking and create a perceived safety issue will raise the level of the related CAM to a written warning. A parking violation of this kind would result in a written warning, even if the violation was a "first ticket." Tr. Exh. 10 at 14-15.

24) On October 16, 2014, Plaintiff filed a discrimination complaint with Boeing's EEO department. Tr. Exh. 3. Plaintiff emailed Heather Frasier, a Human Resource Generalist at Boeing, and attached an EEO complaint form. In her

ORDER – 8

email, she noted that she had attached her "form for the EEO office" and asked Frasier's help to forward the form to the "proper department." *Id.* Because Plaintiff's first draft complaint was incomplete, Frasier responded to her submission by pointing out which pages of the form were important to complete and offering to speak to her about her issues. Tr. Exh. 4. Plaintiff thanked Frasier for her feedback and submitted another draft of her complaint. *Id.*

25) In her submitted complaint, Plaintiff described her viewpoint of the events surrounding her CAM's and took issue with the fact that her union representative was not present when she was disciplined. *Id.* Plaintiff also noted that her laptop was taken away but that others with similar job assignments were allowed to keep theirs. *Id.* Plaintiff states that she is a "woman, minority, and English is not my mother language. As manager and HR, Gary and Kim Conner didn't provide me helpful resources but just want to put black mark on my record in order to get rid of me." *Id.* The form did not indicate exactly how she felt she was being discriminated against due to her status as a minority or woman, only that she felt that she was being treated unfairly and unequally. *Id.*

26) On October 17, 2014, Weber emailed Connor and asked to talk to her about "an employee issue and how to move forward." Tr. Exh. 5. On October 20, 2014, Conner sent herself two emails detailing her meeting with Weber. *Id.* The emails state that Weber's concern "is regarding Mihngna Nguyen [sic] and her continuing to fail to follow directions." The emails also state that Plaintiff "continues to do some work that takes a significant amount of time away from the expected work packages," that Plaintiff would not use a common spreadsheet to log information despite being asked to do so, that there were "other issues", and that Weber had given her "sufficient time and repeated

ORDER – 9

requests to comply with the direction, but she fails to do as requested." *Id*. The emails also note that Conner informed Frasier, since Frasier received emails from Plaintiff on "01/16/2014 [sic] and 01/17/2014 [sic] . . . regarding the corrective action she has received and feeling singled out," and that Weber stated that Plaintiff was not being singled out. *Id*.

27) At the time that Conner wrote these emails, she knew that Frasier had received emails from Plaintiff and that Frasier had discussions with Plaintiff regarding Plaintiff's CAM's. Frasier testified that she did not tell Conner that these discussions and emails were in the context of Plaintiff's EEO complaint or that Plaintiff had filed an EEO complaint because Frasier did not think it was appropriate for Conner to know about it at that time. Dkt. # 130 at 18:17-19:6. Conner also testified that she was under the impression that the emails Plaintiff sent to Frasier were solely regarding her corrective actions and that she did not become aware that Plaintiff had filed an EEO complaint until later. Dkt. # 129 at 52:3-14, 96:15-24.

28) Weber testified that he was not aware that Plaintiff had filed an EEO complaint when he met with Conner on October 17, 2014. Dkt. # 129 at 212:17-25. When Weber first met with Conner, he had not yet made the final decision to terminate Plaintiff, but had "pretty much" made the decision that day. *Id*. at 212:9-12; 215:16-216:6.

29) On October 22, 2014, Plaintiff took a day off of work to take care of her father who was ill and in the hospital. Tr. Exh. 20. Plaintiff testified that she obtained verbal permission from Weber to flex her time to make up for that absence on or around October 12, 2014. However, at her deposition she contended that Weber gave his permission implicitly by signing a time sheet that showed she had worked extra hours on some days the week before her absence. Dkt. # 130 at 85:8-10; Dkt. # 133 Ex. B at 110:2-20. Weber testified

ORDER – 10

that he did not give Plaintiff his permission. Dkt. # 129 at 213:15-214:21. There is no other evidence to support Plaintiff's contention that she received permission from Weber to flex her time or take that day off of work.

30) On October 24, 2014, Weber sent an email to Plaintiff asking why she did not record any time for her October 22, 2014 absence and reiterating that Plaintiff did not ask permission to flex her schedule. Tr. Exh. 20. Plaintiff responded by apologizing and asking to flex her time for that absence. She then asked for permission to flex her time permanently. *Id*. Plaintiff's email does not state that she received permission to flex her time prior to her absence. Weber replied by reiterating that Plaintiff did not inform him that she intended to be absent on October 22, and refusing her request to continue to flex her time moving forward. *Id*.

31) On October 22, 2014, Weber emailed Conner and provided her with a memorandum describing the issues they discussed in their meeting. On October 27, 2014, Conner asked Weber to provide documentation to substantiate his claims and to support his description of the problems that he was having with Plaintiff. Dkt. # 129 at 215:16-216:6; Tr. Exh. 19. Weber also asked Harvey to gather related documentation and submitted that along with other information to Conner on October 28, 2014. Tr. Exhs. 22-24.

32) On or about October 27, 2014, Conner met with Plaintiff and her union representative to discuss the issues raised by Weber. Dkt. # 129 at 104:4-105:10. Because Conner did not feel as though Plaintiff gave her direct answers to her questions, Conner followed up with Plaintiff in writing, asking for Plaintiff's view of the situation. Dkt. # 129 at 105:7-16; Tr. Exh. 21. The email detailed four examples of situations where Weber asked Plaintiff to do something, and Plaintiff did not follow his directions. *Id*. In Plaintiff's response, she indicated that felt she was being treated differently than other

ORDER – 11

employees in the same group, that she was concerned that Conner and Weber were working together to give her CAM's and suspensions, and that she was being targeted for termination. Tr. Exh. 21.

33) Conner then met with Weber to review Plaintiff's responses and discuss the supporting documentation Weber sent Conner on October 22 and 28. Dkt. # 129 at 120:3-13. After reviewing Plaintiff's responses, Weber made the final decision to discharge Plaintiff. Dkt. # 129 at 215:10-216:14. Conner testified that the decision to terminate Plaintiff was made on or around October 28 or 29, 2014. *Id.* at 120:9-20. Conner's testimony is supported by Weber's testimony as well. Weber stated that he did not remember the exact date he made the final decision, but that it was "probably that following week" after he sent supporting documentation to Conner. *Id.* at 215:10-22.

34) After Weber informed Conner that he had decided to proceed with the termination, Conner reached out to Frasier to let her know. *Id.* at 120:21-121:10. Frasier then informed Conner that Plaintiff had filed an EEO complaint and that it needed to be investigated. Dkt. # 129 at 120:21-121:7, 216:7-18; Dkt. # 130 at 19:7-17. Weber testified that at the time he made the decision to terminate Plaintiff's employment, he did not yet know that Plaintiff had filed an EEO complaint. Dkt. # 129 at 215:10-216:14.

35) On November 3, 2014, Plaintiff received another parking ticket. Tr. Exh. 25.

36) On November 4, 2014, Frasier submitted Plaintiff's complaint to David Wuerch in Boeing's EEO department. Tr. Exh. 26. Wuerch and Frasier exchanged emails regarding the content of the complaint and Frasier indicated that she met with Plaintiff in order to "try to understand the basis of her complaint," and noted that Plaintiff incorporated some additional information. *Id.* Frasier noted that Plaintiff had received another parking ticket and that this ticket should result in termination. *Id.* On November 13, 2014, Wuerch wrote

ORDER – 12

to Frasier that he did not see any "EEO issues" and that they could proceed with Plaintiff's termination. *Id*. Dkt. # 129 at 121:8-122:21, 216:25-217:4; Dkt. # 130 at 19:21-21:8. Conner was informed of the EEO office's decision on November 14, 2014. Tr. Exh. 26.

37) On November 20, 2014, while Weber was out on medical leave, Sellers, Conner, and another Human Resources employee, Ayesha Riaz, attended the termination meeting with Plaintiff. Dkt. # 129 at 123:17-124:9, 129:5-16. Sellers informed Plaintiff that she was being issued two additional CAM's. Tr. Exhs. 27, 28. The first was issued because of the November 3, 2014 parking violation. The Expected Behavior category for this CAM was "Adhere to company agreements, policies and procedures. *Id*. The other CAM was Plaintiff's third CAM for a "Failure to Comply" violation in the "Produce, design, and support our products and services" category. Specifically, the CAM was issued for Plaintiff's failure to obtain manager approval to flex her schedule, failure to stop using a specific tool when working on functional schematics and to stop working on the 787-10 program when requested by her manager, and failure to start using a common process when requested by her manager. *Id*. As this CAM was Plaintiff's third in the same Expected Behavior category, it was the basis for Plaintiff's termination. Dkt. # 129 126:11-129:4. Sellers then informed Plaintiff that he was terminating her employment with Boeing for failure to follow employer directives. Dkt. # 129 at 129:22-130:19.

38) What transpired after Sellers informed Plaintiff that she was being terminated is disputed by the parties. What is undisputed is that at some point Plaintiff became distressed by her termination, security was called, and shortly thereafter, Plaintiff became unresponsive and the paramedics were called.

ORDER – 13

Dkt. # 129 at 120:22-133:22; Dkt. # 130 at 98:1-106:16; Dkt. # 131 6:16-15:10.  When Plaintiff became responsive again, she exited the premises.  *Id.*

### III.  CONCLUSIONS OF LAW

The Court analyzes Plaintiff's state and federal retaliation claims under the same framework.  *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065-1066 (9th Cir. 2003) (finding that Washington courts look to federal law when analyzing retaliation claims, and utilizing the three-part burden shifting test described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in a statutorily protected activity, (2) defendant took some adverse employment action against her, and (3) there is a causal connection between the protected activity and the adverse employment action.  *Id.* at 1065-1066; *Corville v. Cobarc Servs., Inc.*, 869 P.2d 1103, 1105 (Wash. Ct. App. 1994).  If a plaintiff establishes a prima facie case, the evidentiary burden shifts to the employer to produce admissible evidence of a legitimate, nondiscriminatory reason for the discharge.  *Stegall*, 350 F.3d at 1066; *Hollenback v. Shriners Hospitals for Children*, 206 P.3d 337, 344 (Wash. Ct. App. 2009).  If the employer meets its burden, the presumption is removed and the employee must then establish pretext.  *Stegall*, 350 F.3d at 1066; *Hollenback*, 206 P.3d at 344.  "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."  *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220-22 (9th Cir. 1998)).  In some cases, a combination of indirect and direct evidence can establish pretext.  *Id.*

ORDER – 14

**A. Plaintiff failed to demonstrate a causal connection between her protected activity and her termination.**

1) It is undisputed that Plaintiff engaged in protected activity when she filed her EEO complaint in October of 2014 and that her termination in November of 2014 was an adverse employment action.

2) Plaintiff did not show by a preponderance of the evidence that her filing of an EEO complaint was one of the reasons she was terminated, and that, but for that complaint, she would not have been fired. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002).

3) There is very little evidence to support Plaintiff's contention that Weber learned of Plaintiff's protected activity prior to making his decision to terminate her employment. The only evidence that Plaintiff points to in support of her contention is the October 20, 2014 email that Conner sent to herself, mentioning that Frasier received emails from Plaintiff. This email does not indicate that Fraiser told Conner about the EEO complaint or that Conner then passed on that information to Weber. Frasier, Weber, and Conner all testified that this was not the case.

4) The closeness in time between the filing of Plaintiff's complaint and her termination is also insufficient to support an inference of causation without other supporting evidence. Plaintiff points to the fact that Weber gathered additional documentation and evidence regarding his issues with Plaintiff and asked that Harvey aid him, as evidence that Plaintiff's complaint led him to move forward with her termination. However, the record shows that Weber gathered this information at Connor's request. While Weber was acting to gather evidence to support his statements, there is no indication that he was taking this action because of her complaint and the action itself does not support an inference that he had knowledge of the complaint. Plaintiff points to no other circumstantial evidence to support an inference of causation. *See*

ORDER – 15

*Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.").

5) Plaintiff has not shown by a preponderance of the evidence that her complaint was a substantial factor in Weber's decision to terminate her, or that it was a reason she was terminated.

**B. Defendant met its burden to produce evidence of a legitimate, nondiscriminatory reason for Plaintiff's discharge.**

1) In the months leading up to her termination, Plaintiff displayed a pattern of failing to comply with management direction or company policies. At the time of her termination, Plaintiff had five CAM's. While not all of these CAM's were in the same Expected Behavior category, all five involved situations where Plaintiff refused to follow management direction or company policy. Defendant also produced evidence of several other instances where Plaintiff failed to comply with management direction for which she did not receive a corrective action.

2) Three of Plaintiff's CAM's were a result of a "Failure to Comply" violation in the "Produce, design, and support our products and services" category. Pursuant to Boeing's employee corrective action policy, the corrective action process does not necessarily include every step, and can begin with any level. Three CAM's in the same Expected Behavior category is sufficient grounds for termination.

3) Defendant has established a legitimate, nondiscriminatory reason for Plaintiff's discharge.

ORDER – 16

**C. Plaintiff failed to demonstrate that Defendant's legitimate, nondiscriminatory reason for her termination was pretextual.**

1) Other than conclusory statements made in her testimony, emails, and EEO complaint, Plaintiff provided no direct or indirect evidence of discrimination. *See Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000). Plaintiff alleged that she was being treated differently than other employees with regards to several of her infractions, specifically with regards to the enforcement of parking violations, the handling of her absence on July 21, 2014, whether she was allowed to use a laptop, and whether she was allowed to flex her schedule. However, Plaintiff provided no concrete details or other testimony to support her claims of alleged unequal treatment.

2) Plaintiff provided no evidence to support her claims that she was not treated equally to those outside her protected class or that employees outside her protected class were "treated better for offenses of comparable seriousness." *See Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 694 (9th Cir. 2017) ("the fact that persons outside the plaintiff's protected class were treated better for offenses of comparable seriousness could also help demonstrate pretext").

3) Plaintiff provided no evidence that Boeing's proffered explanation for Plaintiff's termination was internally inconsistent or otherwise not believable.

4) Plaintiff provided no evidence that unlawful discrimination motivated Boeing in any way to terminate her.

//
//
//

ORDER – 17

## IV. CONCLUSION

For the reasons stated above, the Court finds against Plaintiff for her claims of retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Washington Law Against Discrimination, RCW 49.60 *et seq*. The clerk shall enter judgment for Defendant.

DATED this 28th day of November, 2018.

The Honorable Richard A. Jones
United States District Judge

ORDER – 18